UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO. 20-cr-77-T-36TGW

UNITED STATES OF AMERICA,
                  Plaintiff,
v.

JOSE ISMAEL IRIZARRY
                Defendant.    /

## OBJECTIONS TO PRE-SENTENCE INVESTIGATION REPORT

Defendant, JOSE ISMAEL IRIZARRY (hereinafter "Irizarry"), pursuant to Fed. R. Crim. P. 32, files his objections to the pre-sentence investigation report (PSI).

In support of these objections, Irizarry states as follows:

## RELEVANT FACTUAL BACKGROUND

The following is a factual background that is relevant to the case at bar.

The funds referred to in the indictment and plea agreement as "drug proceeds," are in fact funds obtained from what is called an AGEO. An AGEO is an "Attorney General Exempt Operation. In fact, this AGEO was what is referred to as a "Full" AGEO, which are case-specific and designed to facilitate multiple transactions executed within a single investigation, with the primary goal of dismantling a specifically targeted criminal organization. These operations, however, have a temporary net effect of allowing funds to be disbursed to Drug Trafficking Organization.

While the ultimate goals of AGEOs support the DEA's mission to disrupt and dismantle drug trafficking organizations (DTOs), the collateral consequence of temporarily assisting the basic operation of DTOs does not. As such, the DEA Administrator and the Attorney General, by law and Department Policy, must approve the establishment and extension of all AGEOs in order to provide exemption from certain legal restrictions, and authorization to conduct otherwise illegal activities.

In order to fulfill this requirement, DEA field offices submit AGEO proposals through the DEA Sensitive Activity Review Committee (SARC), which is comprised of a host of DOJ and DEA representatives. DEA representatives to the SARC include the Chief of Global Enforcement, the Chief Counsel, the appropriate Office of Global Enforcement Section Chief(s), the Chief of the Undercover and Sensitive Investigations Section, relevant domestic Special Agents in Charge or Regional Directors of International offices, and Case Agents. DOJ representatives to the SARC are from the Criminal Division's Money Laundering and Asset Recovery Section (MLARS), Narcotic and Dangerous Drug Section (NDDS), and Office of International Affairs (OIA).

Through AGEOs, the DEA often uses confidential sources (CSs) and undercover Agents (UCAs) to drive money laundering cases. A typical money laundering transaction conducted as part of an AGEO would involve a Confidential Source advising a DEA Case Agent that a specific target in Colombia had, for example, $500,000.00 in drug proceeds in a certain city and that the target wanted the CS lo launder the funds back to Colombia. Upon approval from the DEA Agent, the CS would come to an agreement with the target as to the commission fee (usually ranging between 3% and 10%) to be charged for his or her services. Thereafter, the Case Agent would coordinate with the DEA Field Office in which the bulk cash was located in order to accomplish a money pickup.

UCAs picked up the bulk cash in a controlled street operation, counted the money, and then deposited it in a local branch of the bank in which the DEA had an undercover bank account. The funds were then wire transferred to the DEA Miami AGEO-approved (case-specific) undercover bank account. The commission fee, previously agreed upon by the CS and the target, would be taken out of the total deposit and transferred to a commission account dedicated to DEA Project Generated Income (PGI). AGEO authority allows for the DEA to use PGI funds to offset expenses pertinent to the case which generated the funds, for travel, purchase of electronic equipment, purchase of vehicles, travel expenses, rent of undercover office space, and other expenses. The AGEO in the case at bar was an

income producing operation.

Case Agents conducted such transactions hundreds of times over the course of the AGEO. The ability to liberally apply PGI to fund case expenses became a major factor in the decision by DEA executive management and the SARC to continue to approve six-month extension requests and allow AGEOs to run for years on end, whether or not the originally stated investigative goals were met. Money Laundering groups and their executive management operated under the endemic philosophy that as long as money seizures continued and PGI was being generated by the AGEO, indictment of targets was a secondary priority of the AGEO. All proposed PGI expenditures were approved by the Group Supervisor, Assistant Special Agent in Charge (ASAC), the Special Agent in Charge (SAIC), and were also reviewed by DEA Headquarters.  For example, in the course of one AGEO run by the Miami Field Division, DEA spent approximately $2,000,000 in PGI funds on official and personal travel for DEA, ICE, and FBI Agents, Assistant US Attorneys, and CSs. Further, CS payments were also paid from the PGI funds.

Not surprisingly, the Office of the Inspector General of the DOJ (OIG) found that the "internal control framework over AGEOs was inadequate to mitigate risk, ensure compliance with statutory requirements, and safeguard funds from fraud, waste and abuse." OIG press release, June 17, 2020.

### **THE OFFENSE CONDUCT, AS PHRASED, IS MISLEADING**

1. Irizarry objects to the offense conduct <u>as</u> recapitulated under "Offense Conduct," commencing in page nine (9) paragraphs 23 through page 16 paragraphs 48.
2. In essence, Mr. Irizarry was participating in Operation Whitewash.  This operation was classified as a Full Attorney General Exempt Operation. (AGEO).
3. The goal of the operation was to "target, infiltrate, and dismantle drug trafficking and money laundering organizations."  The methodology, however, included allowing funds

       to be received and wired to confidential sources that would in turn transfer the funds to the Drug Trafficking Operations. These confidential sources were also acting under the auspices of the program.

4. In the case at bar, funds were collected from couriers who believed they were handing the money to other couriers or launderers. The funds were in turn deposited into DEA controlled accounts opened under the AGEO program. The AGEO program also produced a profit or income that was being used to fund the program and other operations.

5. One of Mr. Irizarry's errors was that he wired the money to the CS and allowed the CS to handle the funds at the discretion of the CS. The funds received from the DEA account were taken by the confidential source and sold in the black-market peso exchange. This practice on the part of the CS produced significant income for the CS.

6. Mr. Irizarry eventually realized what was happening and did not put a stop to it. He also did accept funds from the CS as stated in the Pre-Sentence Investigation.

### THE APPLICATION OF THE SIX LEVEL EXHANCEMENT IN PARAGRAPH 56 IS IN ERROR

7. The facts of this case insofar the applicability of §2S1.1 appears to be a case of first impression.

8. As the basis for the application of this subsection, the PSI indicates that Mr. Irizarry knew that "the laundered funds were drug proceeds from a Colombian drug trafficking organization involving cocaine." Par. 56

9. This is factually wrong. The nature of the funds had in fact changed when they were deposited in a DEA controlled account. The funds sent were furthermore comingled with other seized or intercepted funds.

10. In its relevant part, §2S1.1 states:

    (b)    Specific Offense Characteristics

> (1) If (A) subsection (a) (2) applies; and (B) the defendant knew or believed that any of the laundered funds were the proceeds of or were intended to promote (i) an offense involving the manufacture, importation, or distribution of a controlled substance or a listed chemical; (ii) a crime of violence; or (iii) an offense involving firearms, explosives, national security, or the sexual exploitation of a minor, increase by 6 levels. 18 USCS Appx § 2S1.1

11. The issue before this Court is not exactly the one dealt with in *US v. Breque*, 964 F.2d 381, 1992 U.S. App. LEXIS 13469 (5th Cir.) and the intention behind the November 1, 1991 amendment that included the Defendant's belief.  However, the Court's analysis of the Commission's **motive and reasoning** for the amendment, however, is important to the analysis of the issues before this Court in this case.

12. The 1991 amendment changed the text to "knew or believed "from knew.  This was intended to prevent the interposition of the impossibility defense when controlled funds were received by a Defendant in a DEA operation.

13. However, the basis of the impossibility defense is premised on circumstances as understood or believed by the Defendant [*United States v. Contreras*, 950 F.2d 232, 237 (5th Cir.1991) (impossibility is not a defense if the crime could have been committed had the attendant circumstances been as the actor believed them to be), cert. denied, _ U.S. _, 112 S. Ct. 2276, 119 L. Ed. 2d 202 (1992) United *States v. Perez*, 992 F.2d 295, 298 (11th Cir. 1993)].

14. In the case at bar, however, Mr. Irizarry **knew** that the funds were transferred into accounts that were government-controlled *ad initio*.  These funds changed in character from the moment that they were deposited and were in fact comingled with other funds present in the account.  Thus, Mr. Irizarry's "belief" or understanding as to the nature and character of the funds – the relevant point in this analysis – points to his use of these funds not as proceeds of specified illegal activity. See *United States v. Barton*, 32 F.3d 61, 67 (4th Cir. 1994).

5

15. Thus, Mr. Irizarry did not "know or believe" and his intention was not the promotion of a specified activity. If Mr. Irizarry in fact was stealing or misappropriating the funds, this increase should not apply.

## THE "RULE OF LENITY" REQUIRES THE COURT TO AFFORD MR. IRIZARRY THE MOST FAVORABLE INTERPRETATION IN RESOLVING AMBIGUITY ISSUES REGARDING APPLICATION OF THE GUIDELINES.

16. The "rule of lenity" applies to the interpretation of the Sentencing Guidelines, requiring the court to "infer the rationale most favorable to the defendant and construe the guidelines accordingly." *See U.S. v. Fuentes-Barahona*, 111 F. 3d 651 (9th Cir. 1997); *U.S. v. Martinez*, 946 F. 2d 100 (9th Cir. 1991).

17. The rule states that when there are two rational readings of a criminal statute, one harsher than the other, the court is to choose the harsher only when the language is clear and definite. *See U.S. v. Drury*, 344 F. 3d 1089 (11th Cir. 2003) (*citing McNally v. U.S.*, 107 S. Ct. 2875 (1987)); *see also U.S. v. Canales*, 91 F. 3d 363 (2nd Cir. 1996). *See also*, *Crandon v. U.S.*, 110 S. Ct. 997 (1990) ("appropriate to apply the rule of lenity in resolving *any* ambiguity in the ambit of the statute's coverage.")

18. The application notes for §2S1.1, U.S.S.G. provides the following definition:

    "***Criminally derived funds***" means any funds derived, or represented by a law enforcement officer, or by another person at the direction or approval of an authorized Federal official, to be derived from conduct constituting a criminal offense." *See* §2S1.1, U.S.S.G. n.1.

19. The ambiguity in this case lies in the application of this adjustment to funds that were seized or intercepted by the DEA pursuant to Federal authorization and the interplay with the words "know or believe" to these facts.

20. The ambiguity is created by the PSI ignoring the fact that the funds came from DEA controlled accounts and that the defendant was himself a law enforcement officer.

21. Applying the rationale of the "rule of lenity" to this issue, in light of relevant jurisprudence which focuses on the knowledge of the person should foreclose the

6

application of this adjustment to this case, and the court to afford Mr. Irizarry the most favorable interpretation in resolving the ambiguity issues regarding application of the guidelines.

## RELIEF REQUESTED

WHEREFORE, Defendant, IRIZARRY, requests this Court grant the requested relief and not impose the six (6) level adjustment.

## CERTIFICATE OF SERVICE

I HEREBY certify that on February 1, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully submitted,

HUMBERTO R. DOMINGUEZ, P.A.
150 W. Flagler Street, PH2900
Miami, Florida  33130
Telephone:    305-373-6400
Facsimile:     305-373-0396
E-Mail: bert@hdominguezlaw.com

/s/*Humberto R. Dominguez*
By:_____
Humberto R. Dominguez, Esq.
Florida Bar No.  837903