1

2          UNITED STATES OF AMERICA
          UNITED STATES DISTRICT COURT
3           MIDDLE DISTRICT OF FLORIDA
                  -   -   -
4
       HONORABLE CHARLENE EDWARDS HONEYWELL
5        UNITED STATES DISTRICT JUDGE PRESIDING

6  UNITED STATES OF AMERICA,          )
                                      )
7               PLAINTIFF,            )
                                      )
8               VS.                   )8:20-CR-77-CEH-TGW
                                      )
9  JOSE ISMAEL IRIZARRY,              )
                                      )
10                                    )
                  DEFENDANT.          )
11  _____)

12
                   **SENTENCING HEARING**
13         REPORTER'S TRANSCRIPT OF PROCEEDINGS
                    JUNE 23, 2021
14                 TAMPA, FLORIDA

15

16

17

18

19

20  SHARON A. MILLER, CSR, RPR, CRR, FCRR
    IL CSR 084-2617
21  FEDERAL OFFICIAL COURT REPORTER
    801 N. FLORIDA AVENUE, SUITE 13A
22  TAMPA, FLORIDA 33602

23  Proceeding recorded by stenography,
    transcript produced by computer-aided transcription
24

25

1   APPEARANCES OF COUNSEL:

2   ON BEHALF OF PLAINTIFF:

3           UNITED STATES DEPARTMENT OF JUSTICE
            BY:  MR. JOSEPH PALAZZO, ESQ.
4                MR. MARK A. IRISH, ESQ.
            1400 New York Avenue, Suite 10302
5           Washington, DC  20001
            (202)445-7910
6

7

8   ON BEHALF OF DEFENDANT:

9           HUMBERTO R. DOMINGUEZ, PA
            BY:  MR. HUMBERTO R. DOMINGUEZ, ESQ.
10          150 W. Flagler Street
            Miami, Florida 33130
11          (305) 373-6400

12

13          THE CASTANEDA LAW FIRM
            BY MS. REBECCA CASTANEDA, ESQ.
14          506 N. Armenia Avenue
            Tampa, FL  33609-1703
15          (813)694-7780

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1                    I   N   D   E   X

2    WITNESSES                                    PAGES

3

4                    JOSE ISMAEL IRIZARRY

5    Direct examination by Mr. Dominguez          36

6    Cross-examination by Mr. Palazzo             40

7    Redirect examination by Mr. Dominguez        45

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

     UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1  (Court in session at 10:10 a.m.)

2          THE COURT:  We are here in the matter of United

3  States of America versus Jose Ismael Irizarry, 20-cr-77.

4  Counsel, please identify yourselves for the record.

5          MR. PALAZZO:  My name is Joseph Palazzo and I am

6  representing the Government along with my colleague Mark

7  Irish, and at Counsel table with us is FBI Special Agent

8  Deven Williams.

9          THE COURT:  Okay.  Thank you.

10          Counsel for the Defendant.

11          MR. DOMINGUEZ:  Good morning.  Humberto Dominguez on

12  behalf of Jose Ismael Irizarry and I am also joined by

13  Rebecca Castaneda at Counsel table as well.

14          THE COURT:  The other person at counsel table?

15          MS. CASTANEDA:  It's Rebecca Castaneda.  I have my

16  mask on.

17          THE COURT:  Thank you.  Yes.  I couldn't see you.  I

18  wouldn't have recognized you.  Thank you for saying

19  something.

20          All right.  And the Defendant is present.  Madam

21  Clerk, please place the Defendant under oath.

22          COURTROOM DEPUTY CLERK:  Sir, please rise and raise

23  your right hand.

24  (Defendant sworn.)

25          COURTROOM DEPUTY CLERK:  Please state your name for

1    the record and spell your last name.

2            THE DEFENDANT:  Jose Irizarry, I-R-I-Z-A, double

3    R-Y.

4            COURTROOM DEPUTY CLERK:  Thank you.  Be seated.

5            THE COURT:  All right, Mr. Irizarry, you are before

6    the Court this morning, sir, for sentencing based upon a

7    plea of guilty you entered on September 14th to Counts One

8    through Nineteen of an indictment which charged you with the

9    following crimes:  In Count One you were charged with

10   conspiracy to commit money laundering.  This is a violation

11   of Title 18, United States Code, Section 1956H.

12           In Counts Two through Five you were charged with

13   honest services wire fraud.  This is a violation of Title

14   18, United States Code, Sections 1343 and 1346.

15           Count Six charged you with conspiracy to commit bank

16   fraud.  This is a violation of Title 18, United States Code,

17   Section 1349.

18           Counts Seven through Twelve charged you with bank

19   fraud.  This is a violation of Title 18, United States Code,

20   Sections 1344.

21           Count Thirteen charged you with conspiracy to commit

22   aggravated identity theft, and this is a violation of Title

23   18, United States Code, Section 371.

24           And Counts Fourteen through Nineteen charged you

25   with aggravated identity theft, again a violation of Title

1    18, United States Code, Section 1028A.

2          The Court has previously accepted your guilty plea,

3    Mr. Irizarry, and has adjudicated you guilty of these

4    offenses.  As I've indicated, we're here today for

5    sentencing, however, before I impose sentence, I'm going to

6    ask you a few questions, I'm going to ask questions of your

7    Counsel and questions of Counsel for the United States.  I'm

8    also going to give you an opportunity to make a statement to

9    the Court if you choose to do so.

10         Before we start, just give me one moment to log on

11   here in the courtroom.

12         All right.  The first question for you,

13   Mr. Irizarry, is have you had an opportunity to review and

14   discuss with your attorney the presentence investigation

15   report?

16         THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  Do you have any questions of the Court

18   regarding that report?

19         THE DEFENDANT:  No, ma'am.

20         THE COURT:  That report contains a number of -- a

21   lot of factual information, information designed to aid the

22   Court in imposing a sentence that is sufficient but not

23   greater than necessary to comply with the statutory purposes

24   of sentencing.

25         Other than any objections raised by your attorney

1    already, do you wish to make objections to the facts in the

2    report?

3            THE DEFENDANT:  No, ma'am.

4            THE COURT:  The report also contains a calculation

5    of the advisory sentencing guidelines range performed by the

6    probation department.  Again, other than any objections

7    raised by your attorney, do you wish to make objections to

8    that calculation?

9            THE DEFENDANT:  No, ma'am.

10            THE COURT:  All right.  Thank you.

11            Mr. Dominguez, have you had an opportunity to review

12    and discuss the presentence investigation report with your

13    client?

14            MR. DOMINGUEZ:  Yes, Your Honor, I have extensively.

15            THE COURT:  And do you wish to make an objection

16    regarding the facts?  I think I recall seeing at least one

17    objection regarding the facts.  If so, you may come to the

18    lectern and make your objection at this time.

19            MR. DOMINGUEZ:  Yes, Your Honor.  Your Honor,

20    basically most of the facts and circumstances were handled

21    by agreement of the parties.

22            THE COURT:  Make sure that you speak into the

23    microphone since you are wearing a mask and that's required,

24    so speak into the microphone so I can hear you.

25            MR. DOMINGUEZ:  Okay.  Basically a lot of the

1    matters in the PSI were handled by the parties ahead of time

2    by agreement.  There was one item which is not which is the

3    six level enhancement for the drug proceeds.

4            THE COURT:  We're not there yet.  That's an

5    objection to the calculation.

6            MR. DOMINGUEZ:  Yes, ma'am.

7            THE COURT:  I thought there was a dispute about the

8    Government's reference or the -- or the reference to the

9    Colombian drug trafficker and you said you've argued at

10   least in your memorandum that he is not a drug trafficker

11   and money launderer.

12           MR. DOMINGUEZ:  Yes, Judge.

13           THE COURT:  That he was someone who purchased, who

14   actually smuggle merchandise into Colombia.  Is there a

15   factual objection regarding that?

16           MR. DOMINGUEZ:  Yes, there is.  It goes to that same

17   calculation.  That's why I was referring to it.  Yes, there

18   is a factual --

19           THE COURT:  Let me just stop you.  Listen to me.

20   Don't interrupt me.

21           MR. DOMINGUEZ:  Okay.  Sorry.

22           THE COURT:  Right now I'm only dealing with factual

23   objections.

24           MR. DOMINGUEZ:  Right.

25           THE COURT:  When I finish the factual objections,

1     I'll deal with objections to the calculation of the

2     guidelines, because as you know, I am required to first

3     determine what the guidelines are.  After I've made that

4     determination, we'll then go to any issues with regard to

5     mitigation and sentencing such as 3553(a) factors, et

6     cetera, but so factually, I just need you to now address

7     your factual objections to the presentence report.

8          MR. DOMINGUEZ:  Right.  It's as to the reference of

9     the gentleman as being a drug trafficker.

10         THE COURT:  And what is your contention with regard

11    to that gentleman?

12         MR. DOMINGUEZ:  Basically his involvement in the

13    illegal activity involved the smuggling of goods and

14    services into Colombia for the purposes of evading Colombian

15    taxes which is what he was doing.

16         THE COURT:  All right.  So you would identify him as

17    what instead of a drug trafficker?

18         MR. DOMINGUEZ:  He is a smuggler of goods I guess is

19    basically what he is.

20         THE COURT:  Is this one that you were referring to

21    as Co-conspirator No. 1 or Co-conspirator No. 2?

22         MR. DOMINGUEZ:  Judge, I think it's Co-conspirator

23    No. 1.  We're trying to avoid mentioning the name in open

24    court.

25         THE COURT:  Right.  That's what I said

co-conspirator, you mean No. 1 or Co-conspirator No. 2.  One
of them was apparently the Godparent of your client's
children, twins.

MR. DOMINGUEZ:  It's that person.

THE COURT:  All right.  Then that's Co-conspirator
1.

MR. DOMINGUEZ:  Yes.

THE COURT:  You say that he is definitely -- that
person is a smuggler.

MR. DOMINGUEZ:  Yes.

THE COURT:  Okay.  Now, with regard to the
calculation of the guidelines, do you wish to make
objections to the probation officer's calculation of the
guidelines?

MR. DOMINGUEZ:  None other than, you know, the ones
I made.

THE COURT:  All right.  You may make your argument
at this time.

MR. DOMINGUEZ:  Basically, Judge, the six level
enhancement in this case is inappropriate because those
proceeds were, in fact, not drug proceeds but rather
proceeds from a DEA account as outlined in my objection.

THE COURT:  Okay.  And is that it?

MR. DOMINGUEZ:  That's it.  The contention are with
those six levels, Judge.  That's it.

1        THE COURT:  Okay.  All right.  Thank you.

2        Mr. Palazzo, have you had an opportunity to review

3   the presentence investigation report?

4        MR. PALAZZO:  I have, Your Honor.

5        THE COURT:  You may return to your seat,

6   Mr. Dominguez.  Thank you.

7        And do you have any objections as to the facts

8   contained in the presentence investigation report?

9        MR. DOMINGUEZ:  I do not, Your Honor.

10       THE COURT:  Do you wish to make any objections as to

11   the probation officer's calculation of the guidelines?

12       MR. PALAZZO:  It's not an objection, but --

13       THE COURT:  Well, actually it is because you said it

14   should be two levels and probation says it's three levels.

15   That would be an objection.  That's with regard to role in

16   the offense.

17       MR. PALAZZO:  Yes, Your Honor.  The Government feels

18   that if this case were to go to trial, we'd prove beyond a

19   reasonable doubt that the Defendant was co-equals with most

20   members of the conspiracy at the very least, but that he did

21   manage one of the co-conspirators.

22       THE COURT:  That being his wife.

23       MR. PALAZZO:  Correct.

24       THE COURT:  All right.  For purposes of the record

25   we are looking at Paragraph 61, which is the adjustment for

1  role in the offense.  Probation attributed three levels for

2  that.  It appears that the Government and the Defendant have

3  agreed it should only be a two level increase and the

4  argument is that because the Defendant only supervised one

5  other individual.  Is that correct, Mr. Palazzo?

6       MR. PALAZZO:  Yes, Your Honor.

7       THE COURT:  Anything else you'd like to say with

8  regard to that, Mr. Dominguez?

9       MR. DOMINGUEZ:  No, Your Honor.  It's accurate.  The

10 only person that he had any control or contact with where he

11 had any authority was his wife, in fact.

12      THE COURT:  Okay.  Then I will sustain the objection

13 with regard to Paragraph 61, adjustment for role in the

14 offense as I believe that the evidence has established by a

15 preponderance of the evidence that indeed the adjustment

16 should be a two level adjustment for the Defendant's role

17 and not a three level adjustment, and so the evidence does

18 indeed reflect that the Defendant directly oversaw or

19 managed his wife who has already been sentenced with regard

20 to this proceeding.

21      All right.  Are there any other objections by the

22 United States?

23      MR. PALAZZO:  No, Your Honor.

24      THE COURT:  All right.  Mr. Palazzo, you may come to

25 the lectern and respond to the Defendant's objection.

1    Again, it's an enhancement so the United States has the

2    burden of proof.

3         MR. PALAZZO:  Thank you, Your Honor.  The facts

4    today are best captured in the plea agreement that's signed

5    by the Defendant.

6         THE COURT:  So is that what you will rely upon as

7    the factual basis for your response to establish the

8    enhancement?

9         MR. PALAZZO:  Yes, Your Honor.  And in that it's

10   Document 59 on the docket.  On Page 27 of the document, the

11   factual basis for the plea, the Defendant on Page 27

12   Subparagraph B agreed and stipulated that he took official

13   actions as a DEA special agent including the following

14   violations of his lawful duty, Subparagraph B, falsely

15   documented and causing DEA special agents to falsely

16   document the true nature and source of wire transfer

17   instructions involved in multiple undercover DEA money

18   laundering investigations including in the investigation of

19   a co-conspirator known to the DEA as a drug trafficker and

20   money launderer in Colombia.

21        Your Honor, I believe that that stipulated fact

22   weighs in favor of the six additional offense levels being

23   correctly recommended by probation.

24        THE COURT:  Okay.

25        MR. PALAZZO:  Furthermore, in the plea agreement the

1    Defendant has agreed not to argue about any facts today and

2    has agreed that the facts in the plea agreement will not be

3    disputed.  So, with that, the Government recommends that

4    those six offense levels be added to the guidelines.

5         THE COURT:  Is there a case law to support your

6    argument?

7         MR. PALAZZO:  Yes, Your Honor.  The Government is

8    going to rely in terms of a legal argument on the papers

9    that I filed prior to today.  The Eleventh Circuit has not

10   decided a case specifically where a Federal agent has been

11   in this money laundering conspiracy directly on point, but

12   when considering the sting provision in 1956, the Eleventh

13   Circuit has found that it is enough for a Defendant to have

14   actual knowledge or should have known that specific funds

15   were tied to drug trafficking.  The fact that the Government

16   intervenes during the money laundering conspiracy has never

17   been found in the Eleventh Circuit to sort of cut off those

18   drug proceeds from being drug proceeds.  I think that in

19   Perez, the Eleventh Circuit found that essentially once drug

20   proceeds always drug proceeds.  They didn't go so far as to

21   say that it would never be possible for Government

22   intervention to eliminate the fact that drug proceeds

23   continue to be proceeds, but in that case which didn't

24   involve a Federal agent but involved a sting where funds

25   were represented to be drug proceeds, the Court said that

1   those facts were more than sufficient and that here we have

2   even stronger connections between the DEA agent's knowledge

3   of the sources of funds and where they were going.

4        Essentially, the Defendant was probably in no better

5   position than anyone to know the source of the funds and to

6   know where those funds were going, so for all those reasons

7   going back to Perez, we believe that the Court should apply

8   those six offense levels.

9        THE COURT:  All right.  We're talking about United

10  States Sentencing Guidelines Section 2S1.1.  And is it your

11  contention that both prongs of that guideline apply to this

12  case?

13       MR. PALAZZO:  Yes, Your Honor.  Because while the

14  facts laid out in the plea agreement are that the Defendant

15  received drug proceeds and then diverted them to his own

16  accounts and for his own use, and so not only the receipt of

17  those proceeds but then the use of those proceeds which he

18  knows are source for drugs, they are also violative of the

19  law and implicates that enhanced sentencing guideline.

20       THE COURT:  And the Defendant in his responsive

21  memorandum attempts to distinguish Perez which is the United

22  States versus Perez, 992 F.2d 295, Eleventh Circuit case

23  from 1993, and, in fact, refers the Court to U. S. versus

24  Breque, B-r-e-q-u-e, 964 F.2d 381 from the Fifth Circuit.

25       Have you had an opportunity to review that case, and

1    if so, do you wish to comment on it?

2         MR. PALAZZO:  Yes, Your Honor.  So I don't have the

3    date in front of me, but the six level enhancement at one

4    point at the time that this Breque case took place --

5         THE COURT:  The amendment?  November 1991.

6         MR. PALAZZO:  That's right.  When it went into

7    affect, it actually expanded the definition and it went --

8    it used to be that the enhancement required the Defendant to

9    know that the proceeds were from drugs, and it was expanded

10   to "knew or believed," and that was in specific reference to

11   a sting.  There's a sting provision in the money laundering

12   statute 1956C I believe and that was essentially where the

13   Government represents that funds were derived from drugs and

14   the Breque case really hits that whether or not Congress had

15   contemplated at the time this specific sting provision.  And

16   eventually they expanded it to sort of solidify that it did.

17   And I think that Perez comes after that.  And Perez says

18   that they don't even sort of need the enhancement because

19   they believe that Congress intended originally that knew,

20   the word "knew" that drugs were involved.  Also the intent

21   of the "knew" resulted to include the word believe, so I

22   don't think it's necessarily directly applicable here

23   because I think just the plain reading of the enhancement

24   and the plain reading of the facts.  You know, this isn't a

25   sting.  Essentially, the Defendant was operating stings.  He

1    was forwarding known drug proceeds derived from drug

2    organizations and so he had the actual knowledge.  It

3    doesn't -- it doesn't even go -- it doesn't even reach --

4    the Court doesn't need to reach legal impossibility.  He had

5    the actual knowledge.  He had the actual contact with drug

6    organizations at times or he collectively, the DEA group

7    that he was working in, so.

8         THE COURT:  Are those facts also in the plea

9    agreement or the presentence investigation report?  Because

10   there are -- I mean of course the presentence investigation

11   report thoroughly identifies facts as well, and so while

12   you've directed the Court to the plea agreement, I think

13   that the factual basis is also in the presentence

14   investigation report; is that correct?

15        MR. PALAZZO:  Yes.  And the presentence report from

16   what I can tell is the same factual basis that's in the plea

17   agreement.

18        THE COURT:  And the Defendant argues basically that

19   the Government's position in this case is misplaced because

20   the nature of the bank account here, given the nature of the

21   bank account and the use of the funds and that he relies on

22   an OIG memo.  What's your response to that argument?

23        MR. PALAZZO:  My interpretation of the Defendant's

24   papers, he admits in there that the funds are commingled

25   with other drug funds.  The emphasis seems to be that

they're commingled therefore that triggers some sort of
cutoff.  I don't have any -- I don't find any authority
saying that that is true, and the Defendant admits that the
commingling is actually with other seized drug proceeds, so
the Government sees it that any way you slice it, money that
is being diverted out of those accounts that the Defendant
controls, he knows, he has actual knowledge that whether
commingled or not they're all derived from drug
organizations, from investigations that are being run by the
DEA, many of which he is directly involved in as the lead
investigator or a key part of the undercover money
laundering investigation.  He is in the best position to
know, so I don't think that the -- I can't find any
authority saying that commingling with other drug funds
would necessarily obviate the knowledge element found in
that six level enhancement.

So for those reasons the Government believes that
the six level enhancement is appropriate and does recommend
it.

THE COURT:  The other matter that you may respond to
is the Defendant's argument as to the facts that CC1 was not
a drug trafficker but instead a smuggler.  I'm looking now
at the plea agreement that you referenced before, Doc. 59,
Page 27 and Paragraph B there, Subparagraph B.  Is that the
same person that we're talking about here?  And if you look

1    at Subparagraph B --

2         MR. PALAZZO:  It is.  I can represent to you that it

3    is, but I'm not prepared to prove that to the Court today,

4    but that was the intention of the Government when these

5    papers were drawn up and when this agreement was made with

6    the Defendant.

7         THE COURT:  And the reason I ask that, because my

8    understanding is that he has agreed to the facts in the plea

9    agreement, and so in the plea agreement the individual is

10   also referred to as a drug trafficker and money launderer in

11   Colombia although has now interposed an objection with

12   regard to that categorization or label of that individual

13   and says that instead he is only a drug -- only a smuggler.

14        MR. PALAZZO:  Yes, Your Honor.  The Government would

15   vigorously oppose that, that argument, and that is not what

16   was agreed upon with the Defendant.  The same individual is

17   again mentioned on Page 32 of the agreement where the

18   Defendant and two co-conspirators purchased a Land Rover, a

19   2015 Land Rover for use by the Defendant and the

20   co-conspirators with diverted DEA drug funds.

21        Again, that is the same individual in question, and

22   there's a further payment of $30,000.  The last paragraph on

23   Page 33 of the agreement mentions an undercover operation by

24   the DEA whereby drug proceeds -- and I'm quoting, "drug

25   proceeds picked up in the Netherlands, 30,000 of which were

wired to Spain on February 18th, 2015."  This is continuing

on Page 34, it was on behalf of a co-conspirator in

Colombia.

          This again is the same, is the same individual that

has been referenced all morning here and this representation

that he is some sort of smuggler and not a drug trafficker

was a surprise to the Government to see in the Defendant's

papers and we don't believe that's true.

          If we were to go to trial, we would enter evidence

otherwise, and, in fact, it's not in the agreement, but I

would represent that that individual in question -- in fact,

it is alleged in the indictment, it's not in the agreement,

that individual was actually listed as the main target of a

major investigation in a document that was written in part

by the Defendant identified as a drug trafficker and money

launderer in a priority target of the Miami DEA group of

which the Defendant was a part, so the Defendant knows very

well that that individual does more than just smuggle items.

          THE COURT:  Okay.  All right.  Thank you.  Was there

anything more?  You stopped, and so --

          MR. PALAZZO:  No, thank you, Your Honor.  I'm sad to

say I'm having trouble seeing you through the fog in my

glasses, and --

          THE COURT:  Well, you know the trick to that is to

put your glasses over the mask.  I have gotten pretty good

1    at this in the year or so now that I have been doing it.

2         MR. PALAZZO:  Thank you, Your Honor.

3         THE COURT:  Mr. Dominguez, did you wish to say

4    anything further with regard to your objection as to the six

5    level enhancement?

6         MR. DOMINGUEZ:  Yes, Judge.  If I may respond to

7    that, a couple things.  The agreement as stated is accurate

8    as far as that person identified which was known to the DEA

9    at that time, okay, but that was based on the information

10   that they had at that time.  It's accurate as to that.  He

11   was known, but the reality is that he is not.  That

12   individual met several times with the DEA, met with AUSAs

13   and prosecutors and they accepted the version that he was

14   not, and, in fact, was a smuggler of goods and that is the

15   truth.  That's the thing --

16        THE COURT:  Are you able to establish that for me

17   today?  I mean basically I'm looking at a plea agreement

18   which your client has signed as being factually correct.  I

19   have nothing that contradicts or controverts that other than

20   your argument that this person is not a drug trafficker but

21   rather a smuggler.

22        When I look at the signed document, Document 59, the

23   plea agreement, he's referred to as a drug trafficker, and

24   absent something to the contrary I'm going to overrule your

25   objection to the facts labeling him a drug trafficker.

1          MR. DOMINGUEZ:  He was referred to as known at that

2    time, and I will call agent -- sorry.  I'll call my client

3    to testify to all the meetings that they had with this

4    gentleman which I was present at by the way back then with

5    the AUSAs that they know about, and I don't understand why

6    they're saying something other than that now because they

7    know that this, in fact, happened.  It was in the Dominican

8    Republic, but I will call Jose Irizarry.

9          THE COURT:  Before you do that, let me ask, does

10   that make a difference with regard to the guidelines in this

11   case?  I don't think that it does.  So I mean I'm happy to

12   have you do that, and I'm going to resolve the issue, but I

13   don't think it makes a difference with regard to the

14   calculation of the guidelines.

15         MR. DOMINGUEZ:  Well, Judge, the only reason I say

16   that, because that's the only thing they have to say, it's

17   drug proceeds.  The other thing is controlling case law.

18   This is an OIG.  This money coming from here is being

19   misappropriated, which is what he did incorrectly here by

20   Mr. Irizarry.  This money was being picked up by agents all

21   over the United States.  This money was being utilized by

22   the government and then that makes all the other people

23   co-conspirators.  There were prosecutors traveling with this

24   money.  There were other agents traveling with this money.

25   They were going to dinners.  They were having all sorts of

1    social events with this money.  All this was going on with

2    this money, so that would make all these members of the

3    Government co-conspirators.

4         The Government itself, the DEA was making a

5    percentage of it for moving this money.  That's the whole

6    thing.  This money was all documented.  It was all

7    controlled.  It was all moved from that account.  It's not

8    like he had this pot of money just sitting out there and he

9    was then moving it.  This actually went into an account in a

10   bank that was controlled exclusively by the Government.

11        THE COURT:  What about the gifts he got?

12        MR. DOMINGUEZ:  Those were gifts -- that's why we're

13   dealing with the Diego issue here.  The only person --

14        THE COURT:  That's why you're dealing with what?

15        MR. DOMINGUEZ:  The issue of the CS, the known

16   person, because that's the only one they could claim,

17   because that would be the only money that could have been

18   clouded, but that comes from that gentleman who's, in fact,

19   not a drug trafficker.  He's not.

20        THE COURT:  Okay.  Well, the evidence before me

21   presently is that he is, reflects that he is.

22        MR. DOMINGUEZ:  That's why I'd like to call

23   Mr. Irizarry to testify.

24        THE COURT:  All right.  Mr. Irizarry, come to the

25   stand, sir.

1        MR. DOMINGUEZ:  Do you want him here?

2        THE COURT:  It depends on how long you think you're

3    going to be.

4        MR. DOMINGUEZ:  It's going to take a few minutes.

5        THE COURT:  All right.  Go to the witness stand.

6    You're already under oath, so you've been sworn in already.

7        All right.  Mr. Dominguez, you may inquire.

8        MR. DOMINGUEZ:  Great.  Thank you, Your Honor.

9    Could we agree that we don't mention the person's name?

10       MR. PALAZZO:  That's fine, Your Honor, but just

11   again before we get started, I do want to tell you that the

12   Government's position is that all the money that we're

13   talking about today in the account that I guess is going to

14   be discussed I think the Defendant's already stipulated that

15   it's drug money, so whether or not it's commingled or who

16   put it in there or if the Defendant was responsible for

17   putting it in there, our allegations and our facts before us

18   today are about him taking them out, making material

19   misrepresentations to divert those funds out for his own

20   purposes, so regardless of the testimony we're about to hear

21   today, I think it doesn't really matter as to the fact of

22   whether those were drug proceeds in that account.

23       THE COURT:  And what are you relying upon?  Again,

24   for the record and what has to be established at sentencing

25   hearings and Court has to have a factual basis for its

1  findings.  What are the facts in the record that you're

2  relying upon with regard to the drug money?  You say your

3  factual basis.  Are you looking at the plea agreement,

4  Document 59?

5        MR. PALAZZO:  Yes.  Again, it's what I already

6  pointed out in the plea agreement.  This is sort of -- this

7  account now is something separate, so even if what he's

8  talking about, even with what he's talking about he shows

9  that other people used it, I don't see how legally it can

10  change the other facts in the plea agreement where he took

11  money from drug Defendants or other CSs that were involved

12  in drug organizations.  This seems -- this seems to be just

13  like a separate argument that even if the Defendant wins

14  doesn't speak to the issue.

15        THE COURT:  Okay.  Well, Mr. Dominguez has requested

16  it.  It is the Defendant's opportunity with regard to his

17  sentencing hearing, and so I will allow some leeway and

18  allow him to provide the testimony.  I'm not sure, I'm not

19  convinced right now that it's going to change the analysis

20  as it relates to the guidelines, but I certainly will listen

21  to the testimony that the Defendant intends to present.

22        MR. DOMINGUEZ:  Judge, I just want to clarify for

23  the Court.  The reason is we agreed to certain facts but we

24  also agreed that I was reserving on this issue as far as the

25  appellate waiver because we were specifically challenging

1    the nature of these proceeds, so wherever it put -- wherever

2    he quoted the language regarding drug proceeds, I said, you

3    know, we're contending you can use it in your language there

4    but it's specifically pointed out that we don't agree with

5    this.

6              THE COURT:  Where did you point that out?  As you

7    know, I didn't take the plea.  The pleas in this division

8    are accepted by the magistrate judges.  So where is that?

9              MR. DOMINGUEZ:  It's on Page 23 of the plea

10   agreement.

11             THE COURT:  This is Document 59, Page 23.

12             MR. DOMINGUEZ:  Yes.  Document 59, Page 23, and it's

13   the second part of the appellate waiver.  Well, it's at the

14   end.  It goes -- it says grounds described in Section 1 on

15   Paragraph 6 of the plea agreement, U. S. Guidelines

16   2S1.1(b)(1)(i) should not apply as legal impossibility;

17   provided, however, that the Government exercises its right,

18   and then specifically that section there says that we're

19   reserving the right to appeal that section because we do not

20   agree with the application of the six levels based on legal

21   impossibility.

22             THE COURT:  But this just says (b)(1)(i).  Isn't

23   there a (b)(1)(i)(2) -- I mean (b)(1) -- let me just get my

24   guidelines.

25             MR. DOMINGUEZ:  It's 2S1.1.

1          THE COURT:  Right.  According to the appellate

2     waiver provision of the plea agreement, and this is

3     Paragraph 7, I'm looking at Paragraph 23, Subsection D, the

4     ground described in Section 1, Paragraph 6 of the plea

5     agreement that United States Sentencing Guidelines, Section

6     2S1.1(b)(1)(i) should not apply as a legal impossibility.

7     But there's also -- let's see.  Okay.  I see.  I see what

8     you did.  I understand.

9          MR. DOMINGUEZ:  So specifically, you know, I didn't

10    want to get into any "I got you" moment because that's what

11    I love to do, here, you agreed to all of this, I got you.

12    No.  I specifically said in good faith, look, put this in

13    there.  You know this is what we're challenging.  You know

14    we're not agreeing to the nature of what you're describing

15    here is drug proceeds, and we're going to reserve specific

16    on this issue on the part of the legal impossibility.

17          As to the funds coming out of that specific AGO

18    operation, that specific account, it was exclusively

19    controlled by the DEA.  If he misdirected the funds or

20    mischaracterized the funds thereafter, he committed theft.

21    He misappropriated that money.  He lied about what the money

22    was being utilized for or where it was going.  That's

23    different than him knowing these are drug proceeds and

24    knowingly moving drug proceeds because they were not.  They

25    were Government controlled, exclusively controlled

1   Government funds utilized by all sorts of individuals, other

2   agents and the agency itself, so that's what we're saying.

3        It's impossible based on the case law and the case

4   law that's been cited because he knew that those funds were

5   DEA funds, and that's what he was doing.  Then the reason

6   we're dealing with the Diego issue is we're saying, well,

7   there were other funds that were utilized by him that he

8   received and it's because that person is, in fact -- well,

9   had been known to the DEA.  It became clarified that he's,

10  in fact, not a drug smuggler which is different in nature

11  and that's what this testimony relates to which I am

12  surprised the Government -- because they know.  They have

13  this evidence.  The government has this evidence.  They have

14  to have this evidence because he met numerous times with

15  Government people, and they know.

16       THE COURT:  Who are you referring to, your client or

17  to CC1?

18       MR. DOMINGUEZ:  CC1 and the client and prosecutors

19  and that's what I'm going to ask him about and, in fact, I

20  was there so I know.

21       THE COURT:  Okay.

22       MR. PALAZZO:  Your Honor, I just want to note the

23  Government's objection to entering new evidence today.  On

24  Page 8 of the agreement, I just want to draw the Court's

25  attention to the Defendant agreeing not to introduce new

1    facts when arguing this legal issue specifically.

2              THE COURT:  Where is that in the agreement?

3              MR. PALAZZO:  Yes.  Document 59 on Page 8 beginning

4    at the top.  The Defendant does not and will not dispute any

5    facts in the factual basis section of this plea agreement

6    but reserves the right to argue at sentencing without

7    introducing new facts that USSG 2S1.1(b)(1)(i) does not

8    apply to the calculation of the guidelines offense level

9    because the Defendant requires -- believes it requires a

10   legal impossibility in this case.  Specifically the

11   Defendant reserves the right to argue at sentencing that

12   drug proceeds interdicted by the DEA during an undercover

13   operation cannot continue to be proceeds for the purpose of

14   the enhancement.

15             And it goes on to further narrow the argument that

16   the Defendant is allowed to make before the Court

17   referencing that United States Breque case that we discussed

18   earlier.  It's very narrow the window that he's allowed to

19   argue here today, and I would hope that the Court would hold

20   the Defendant to that agreement.

21             MR. DOMINGUEZ:  Judge, as the Court can see, it's

22   clear that we don't agree to those funds, the money coming

23   out of the funds.  That's a given.  So the only issue was

24   Diego.

25             THE COURT:  First of all, I'm sorry.  Before you get

1    there, I need you to respond to the argument just made.  I'm

2    looking at Document 59, Page 8, and it does indeed say the

3    Defendant does not and will not dispute any facts in the

4    factual basis section of this plea agreement but reserves

5    the right to argue at sentencing without introducing new

6    facts that United States Sentencing Guidelines, Section

7    2S1.1(b)(1)(i) does not apply to the calculation of his

8    guidelines offense level because the Defendant believes it

9    requires a legal impossibility in this case.  And then so if

10    you'll respond to that, then you can continue your argument.

11    MR. DOMINGUEZ:  I agree that we agreed to that.  I

12    agreed that it points out clearly what we had agreed to and

13    the report we're disputing and that's it.

14    THE COURT:  So then am I about to hear new facts

15    from your client contrary to this agreement?

16    MR. DOMINGUEZ:  It's clarifying the agreement and

17    the definition of the "known to" the DEA.  Because it has to

18    do with that person, the CS1 that's being described as known

19    as being a drug smuggler when in reality he is not.  The

20    truth has to amount for something.  The truth matters.

21    Under Brady if they have that information, they

22    should be the first ones up here saying, Judge, you know

23    what?  This is what we thought at the time.  It's not

24    accurate.  He's actually not that.  This is the truth.

25    That's what they should be doing because that is the truth

1    and it's exculpatory evidence that they have an affirmative

2    duty to turn over if they have that and should be the ones

3    arguing it up here.  Not me.  They should be the first ones

4    up here saying, you know what?  We thought he was, but he's

5    not.  That's what they should be doing.

6              THE COURT:  Response, Mr. Dominguez.

7              MR. PALAZZO:  Mr. Palazzo.

8              THE COURT:  I'm sorry, Mr. Palazzo.

9              MR. PALAZZO:  No.  The Government has fulfilled all

10   its Brady obligations and takes them very seriously and the

11   Government if it had any information that should stop these

12   proceedings would turn it over, I can assure the Court of

13   that.  These proceedings have been a long-time coming,

14   almost a year since the guilty plea.  This is the first that

15   I have heard in the papers that were filed on the last week

16   on the 17th after the original sentencing was postponed

17   three times.  This is the first that I have heard that

18   apparently there is new information about the co-conspirator

19   that he would like to enter into evidence for consideration

20   today.  I don't know of any of it to be true at all and, in

21   fact, we would dispute that fact.

22             THE COURT:  So, Mr. Dominguez, with whom did you

23   meet, did you and your client meet with regard to this

24   issue?  Apparently not the persons present in the courtroom

25   today.

1    MR. DOMINGUEZ: Well, actually that's -- they've

2    known about this since before the plea almost a year ago, I

3    would say not a year ago but at least ten months ago about

4    this issue, about this description of this person, because

5    we've met with them and debriefed.

6    THE COURT: Them. Who are you talking about? I

7    just asked you who is them? I mean I'm looking at three

8    individuals in the courtroom today.

9    MR. DOMINGUEZ: Every single person in here except

10   for the news reporter just about, Judge. I mean Mr. Palazzo

11   was there and all the agents were there. We've discussed

12   all this. This is a matter that's been discussed

13   extensively with them, absolutely. But like I think it was

14   ten months ago, nine months ago, absolutely, this is not new

15   and who --

16   THE COURT: So is it -- Mr. Palazzo, is it that the

17   Government does not agree that that was the role? I guess

18   what I'm baffled with, folks, is that I have a

19   representation that this person is not a drug trafficker.

20   MR. DOMINGUEZ: Right.

21   THE COURT: But rather was a smuggler of goods in to

22   Colombia. And that that information has been provided to

23   the Government, that Mr. Palazzo is aware of it, I guess

24   Mr. Irish and I guess the agent who's here also are all

25   aware of this as you all were present at some meeting. Am I

1   misinterpreting what I'm hearing today?

2           MR. PALAZZO:  Is this to the Government, Your Honor?

3           THE COURT:  It is.

4           MR. PALAZZO:  The Government knows that the

5   individual in question smuggled a lot of things including

6   drugs.  This idea that suddenly -- because I guess plea

7   discussions that are being referred to which normally we

8   don't discuss in open court, that smuggling activity was

9   told to the Government.  Not once does the Government have

10  any idea or have any thought that this is exclusive to

11  non-drug smuggling.

12          The Government's position, and if the Government

13  were to proceed at trial, it would be to introduce evidence

14  that that individual smuggles lots of things including

15  drugs, and the Government got a lot of these ideas from

16  documents that the Defendant put together while he was a DEA

17  agent.  A lot of this information about the drug trafficking

18  came from the Defendant, so now -- I'm just as baffled as

19  the Court, Your Honor, as to why any discussion of non-drug

20  smuggling is suddenly proof that the person was also not

21  involved in drug activity.  I don't know if that's what

22  brother counsel here is trying to get across but that's

23  certainly not the case, and I'm just as surprised as you

24  are, Your Honor.

25          THE COURT:  Mr. Dominguez.

1          MR. DOMINGUEZ:  Judge, it's just so incorrect

2     because it's not.  It's not accurate.  The person is not a

3     drug trafficker, and that's the problem and they don't have

4     any evidence of that.  What we agreed to that he had been

5     known to, and it was Agent Irizarry that had generated some

6     of those reports known at the time, and later on had to

7     clarify that it was not accurate.

8          THE COURT:  Where did he clarify it?

9          MR. DOMINGUEZ:  With them when we were negotiating

10    this entire thing, and we've met with them and told him

11    absolutely during proffers, this person is not this, he is

12    this.  This person met with AUSA Garofallo in the Dominican

13    Republic and a group of other agents in the past.

14          The actual target, the CS actually met with the

15    Government.  Of course they could claim they don't know

16    about it because they didn't search for this, but they have

17    it.  They did meetings.  I was present in the meeting at the

18    Dominican Republic with the U. S. Attorneys and the agents

19    when that occurred.

20          MR. PALAZZO:  Your Honor, if I may, the issue before

21    the Court today is whether the proceeds that are documented

22    in the factual basis for the plea were drug proceeds.  We

23    believe that the Defendant had that knowledge.  Whether or

24    not there were other proceeds from other drug cases that

25    were commingled is somewhat superfluous today.  The

1    Defendant has already agreed through extensive facts that he

2    was involved in protecting drug traffickers and he was paid

3    for that, and the Government's contention is that he was

4    paid with drug proceeds, but even if somehow he was paid

5    with other proceeds, the fact that he was being paid to help

6    a drug trafficking organization is promotional money

7    laundering as well, so, again, any way you slice it, the

8    facts that have already been stipulated to demonstrate that

9    the six level enhancement should be enforced.

10            I would also just go back to the Eleventh Circuit --

11           THE COURT:  Well, before you argue, I'm going to

12   allow the testimony for the record.  Apparently this is an

13   issue that the Defendant has carved out of his appellate

14   waiver so that to the extent he wishes to appeal this issue

15   the Appellate Court will have the testimony that his client

16   would have given.

17           I recognize that the plea agreement does state that

18   no new facts can be introduced, but for purposes of an

19   appeal and so that his record is perfected, you may inquire

20   of your client.

21           MR. PALAZZO:  The Government would just want to note

22   an objection.

23           THE COURT:  Surely.  And I'll give you an

24   opportunity to cross-examine his client.  Go on.

25           MR. DOMINGUEZ:  Yes, thank you, Your Honor, very

1    much.

2                          JOSE IRIZARRY

3    having been first duly sworn under oath, was examined and

4    testified as follows:

5                        DIRECT EXAMINATION

6    BY MR. DOMINGUEZ:

7        Q    Mr. Irizarry, when did you first become aware of

8    this person referred to as CS1?

9              THE COURT:  So that we are all on the same page

10   because we're not using names, the PSR refers to the

11   individual as UCC1, so let's use that terminology.

12             MR. DOMINGUEZ:  UCC1, I'm writing it down, Your

13   Honor.

14   BY MR. DOMINGUEZ:

15       Q    UCC1, that person, when did you become aware of

16   them?

17       A    Around --

18             THE COURT:  I can't hear you, sir.  You're going to

19   have to speak up, speak into the microphone.

20             THE WITNESS:  Sorry, Your Honor.  The exact date I

21   don't know.  Probably 2010, 2011, sir.

22   BY MR. DOMINGUEZ:

23       Q    Speak up a little bit.

24       A    2010, 2011.

25       Q    And what was -- how -- what was your position at the

1   time?

2       A    I was a DEA agent in Group 4 in Miami.

3       Q    And how did you become aware of this person?

4       A    We were at the time starting a money laundering case

5   and he was -- he came about because a confidential source in

6   Colombia brought up his name.

7       Q    He was at the time targeted for what specifically?

8       A    At the time he was when we started and when he was

9   subject in the case, it was a money launderer.

10      Q    Was there also belief that he was involved in drug

11  trafficking at the time?

12      A    At the time there was several reports that he was

13  associated with a group in Colombia the North Valley Cartel

14  and that he was -- there was reporting that he had been --

15  he was using one of the drug routes.

16      Q    And did there come a time when you started to meet

17  with this person?

18      A    Yes, sir, I did.

19      Q    And was that person, in fact, signed up as a source

20  of information?

21      A    At one point he was.

22      Q    And did that person also meet with other agents?

23      A    Yes, sir, he did.

24      Q    And when he met with him, did you do an extensive

25  interview regarding his background?

1    A    Yes, sir, we did.

2    Q    And based on the extensive interviews that you did

3 with his background and all the evidence that you had, what

4 determination did you make as far as what his position was

5 regarding criminal activity?

6    A    That he was a high level contraband smuggler into

7 Colombia.

8    Q    And was this information shared with any AUSAs?

9    A    Yes, sir, it was.

10    Q    And which AUSA was investigating and working with

11 this source?

12    A    Several.  AUSA Garofalo, Andy Hoffman, AUSA Monique

13 Botero and at some point Dustin Davis.

14    Q    And all these people were prominent AUSAs out of the

15 Miami office?

16    A    Yes, sir, they were.

17    Q    And, in fact, some were even supervisors; correct?

18    A    Yes, sir.

19    Q    And did they determine whether or not with your

20 discussions with them, did they determine whether or not

21 Diego was, in fact, a drug trafficker?

22    A    It was always determined that he was a high level

23 money launderer and he helped the Government in

24 investigations related to that subject.

25    Q    But was he, in fact, involved in drug trafficking?

1        A    I never knew that he was, never saw any evidence

2    that he was.

3        Q    And what about the AUSA, did they comment on that?

4    What was your understanding of his position?

5        A    That he wasn't.

6        Q    And again this is AUSA Botero, Garofalo?

7             MR. PALAZZO:  Objection, Your Honor.  I assume the

8    rules of evidence are in play and hearsay is not allowed.

9             THE COURT:  Hearsay in particular, and I shouldn't

10   say the rules of evidence, but hearsay is admissible at

11   sentencing hearings.

12   BY MR. DOMINGUEZ:

13       Q    So Hoffman, Botero.

14       A    Garofalo.

15       Q    Garofalo?

16       A    At some point Dustin Davis.

17       Q    All these AUSAs met with and interviewed UCC1?

18       A    Garofalo, Botero, I think Dustin Davis -- Dustin, he

19   met with his attorney but not Diego himself and Andy Hoffman

20   I do not believe met him directly, just with the attorney.

21       Q    And he was running the investigation for you at the

22   time?

23       A    Yes.  At the time she was, and then it went through

24   Dustin and then Garofalo and Botero.

25       Q    You got clearance from these AUSAs to sign this

1  person up as a source?

2      A    Yes, sir, I believe he was originally signed up by

3  another agency, I believe it was ICE working with us, and

4  then we did it.  I don't remember if we did it first and

5  then ICE.  At some point I think it was us first, then ICE,

6  but I don't remember exactly.

7      Q    Was he, in fact, found useful and credible?

8      A    He helped the Government, yes.

9      Q    Was he credible?

10     A    Yes, sir.

11     Q    And this is the person referred to as UCC1 and then

12 you originally thought and agreed that he was targeted for

13 potential drug trafficking but it became known, in fact,

14 that he is not; is that correct?

15     A    That is correct.

16          MR. DOMINGUEZ:  I have no further questions.

17          THE COURT:  Thank you.  Cross-examination.

18                     CROSS-EXAMINATION

19 BY MR. PALAZZO:

20     Q    Mr. Irizarry, you mentioned that there was reporting

21 that UCC1 was using drug routes; is that right?

22     A    That was the first time when I met him that was the

23 reporting.

24     Q    And what does that mean?  Can you tell the Court?

25     A    It was -- there was a cooperating Defendant.

1      Q    You know, what does using a drug route mean?

2      A    Cooperating Defendant was saying that he was -- he

3    had inherited the drug routes.  Do you want me to go into

4    names, the person he was?

5      Q    No.  Generally when someone --

6      A    All right.  So cooperating Defendant was claiming

7    that he was using the drug routes left by a defunct person

8    in the North Valley Cartel.

9      Q    And what is the North Valley Cartel generally in

10    summary here for the Court?

11     A    North Valley Cartel was morphed after the Cali

12    Cartel was eliminated.  They were mainly in the North Valley

13    which is Cali, Armenia, Manizales.  And they were a drug

14    organization that led at the time by a guy name Wil Varela

15    and they were moving drugs to the United States and to

16    Europe.  And when I met CS1, they --

17          THE COURT:  Excuse me, UCC1.

18          THE WITNESS:  Sorry, sorry.  When I met UCC1, a

19    cooperating Defendant for the Government, was advising that

20    UCC1 had inherited the routes of a person that was defunct.

21    We interviewed UCC -- we interviewed the cooperating

22    Defendant that was advising this and it was determined by

23    AUSA Adam Fels who was at the time had the case that that

24    person was not truthful.  So when I said that that's the

25    1 -- so I meant UCC1 based on that information that he had

1    inherited the routes but that information was deemed not

2    credible by AUSA Adam Fels and at the time that's what led

3    us to be able to sign UCC1 up as a confidential source.

4         Q    And how long was he a confidential source?

5         A    Excuse me, sir?

6         Q    How long was he a confidential source, UCC1?

7         A    It was a --

8         Q    It was a very short period of time; is that right?

9         A    He signed up with DEA short.  I don't know how long

10   he was with ICE, and I don't know how long he was -- when he

11   was signed up with DEA office in Cartagena, but yeah, but

12   with DEA it was very short.  I don't know a time that he was

13   signed up with ICE, though.

14        Q    Mr. Irizarry, did you at one point write a proposal

15   to initiate a major investigation targeting UCC1?

16        A    I didn't write the proposal.  It was written by

17   another Agent George Sombraros [ph.] but, yes, that

18   information was used at the time, and it wasn't correct, but

19   it was -- this is how we -- when I say we, this is how I

20   worked or the Group 4 worked in Miami.

21             At the time in order to get approved for an AGEO

22   which is what everybody or at least we wanted which was an

23   operation that we would be able to launder, use, fund to

24   pick up money, use the commissions to self fund our group

25   and our office, we had to put -- link a drug trafficker or

1     somebody to the writeup and we chose --

2         Q     UCC1?

3         A     We chose UCC1 and it was not accurate.  Whatever was

4     written there was not correct, and it was done for the sole

5     purpose of getting approved for an AGEO and that same system

6     was used.

7         Q     Mr. Irizarry, just focus on my questions.  My

8     question was, did you open and initiate a major

9     investigation into UCC1 and you said yes; is that right?

10        A     Yes, sir.

11        Q     And as part of that initiation, you identified UCC1

12    as a major drug trafficker; is that right?

13        A     Yes, sir.  And the AUSA knew that he was because he

14    was with us at the meeting.

15        Q     And specifically associated with the North Valley

16    Cartel which you've identified today as a major drug

17    organization in the North Valley of Colombia; is that right?

18        A     That is correct.  And it was all not true.  It was

19    done for the sole purpose of getting AGEO approved.

20        Q     And then that investigation where you identified

21    UCC1 as a major drug trafficker with the North Valley

22    Cartel, that, in fact, is one of the investigations that you

23    diverted drug proceeds from; is that right?

24             MR. DOMINGUEZ:  Object to the characterization,

25    Judge.  We don't agree they were drug proceeds.

1          THE COURT:  Overruled.  You may answer the question.

2          THE WITNESS:  I don't think there were drug

3     proceeds.

4     BY MR. PALAZZO:

5          Q    Right.  But in your plea agreement when we -- when

6     you stipulated to facts where we used the word drug proceeds

7     and you agreed that you diverted them for your own purposes,

8     that investigation that you initiated on UCC1 was one of

9     those investigations that you diverted drug proceeds from;

10    is that right?

11         A    We used the money that went into the AGEO account,

12    that money after it was into our AGEO account, it was

13    like -- we used it like operational funds, so once the money

14    hit there --

15         Q    I'm asking you about the --

16         A    I do not believe they were drug proceeds, but, yes,

17    I used them, yes, sir.

18         Q    And those are some funds that are discussed in the

19    plea agreement, is that right, the factual basis for the

20    plea agreement?

21         A    Yes, sir.

22         Q    Where you said that you misrepresented things in

23    reports.  You kept other agents from investigating the

24    subject of your investigation.  That investigation into UCC1

25    was one of the primary investigations that you diverted

1   funds from; is that right?

2      A    Yes, sir.

3      Q    And you characterized them in your writeup to

4   initiate the case as drug proceeds?

5      A    Yes, sir, because that is what we had to do in order

6   to get the AGEO approved.

7           MR. PALAZZO:  No further questions, Your Honor.

8   Thank you.

9           MR. DOMINGUEZ:  If I may follow up briefly, Your

10  Honor.

11          THE COURT:  Yes.

12          MR. DOMINGUEZ:  Thank you, Your Honor.

13                    REDIRECT EXAMINATION

14  BY MR. DOMINGUEZ:

15     Q    At the end of the day, Mr. Irizarry, UCC1 was, in

16  fact, not a drug trafficker; correct?

17     A    That is correct, sir.

18     Q    And the information that was provided in order to

19  target him as a drug trafficker was found to be provided by

20  a person that was not truthful by AUSA Adam Fels; is that

21  correct?

22     A    That's correct.

23     Q    And in reality you knew at the time that those funds

24  were being received that the money received from UCC1 was,

25  in fact, not drug proceeds because he, in fact, was not a

drug trafficker; is that correct?

  A  That is correct.

    MR. DOMINGUEZ:  Thank you.  No further questions,
Your Honor.

    THE COURT:  Mr. Irizarry, you may return to your
seat.  Any additional argument?  We were discussing the
issue of the weather UCC1 was correctly identified in the
presentence investigation report as a drug trafficker as
that was the basis for the objection.  Anything else on
that?

    MR. DOMINGUEZ:  No, Judge.  I would briefly proffer
that there is, in fact, memorandum generated by the Miami
office calling that source as untruthful and it was provided
to a judge, a Federal judge advising the Court that that
person that provided the information was untruthful and
these are all things readily in the possession of the
Government.  If they chose not to look for it, that's on
them.

    THE COURT:  Why didn't you discuss this with
these --

    MR. DOMINGUEZ:  We have.

    THE COURT:  -- these attorneys?

    MR. DOMINGUEZ:  I have, Judge, months and months and
months ago.  We have met for hours and hours and days,
Judge.  We have --

1          THE COURT:  The memo that you're talking about

2    you've shown to --

3          MR. DOMINGUEZ:  No, it's not because it's sealed,

4    but they can get it because their office generated it.  It's

5    sealed.  I'm not allowed to get a copy of it but they told

6    them all about this stuff.  They've known all this, Judge,

7    for at least ten months.  We've met for days on these

8    issues.

9          MR. PALAZZO:  Your Honor, it's unclear to me what

10   issue the Defendant is putting forth, but I sort of dispute

11   all of what I've heard so far, if I understand correctly.

12         THE COURT:  Do you know anything about a memo to a

13   Federal Judge where the  --

14         MR. PALAZZO:  No, Your Honor.

15         THE COURT:  -- the Government has indicated that

16   UCC1 was indeed not a drug smuggler?

17         MR. PALAZZO:  No, Your Honor.  And I believe -- no,

18   Your Honor.  And what I believe the Defendant is saying is

19   that a separate cooperating Defendant in another case years

20   back may have made statements to the Defendant that then

21   another office I guess determined it didn't want to move

22   forward on charging a case.  This is what I surmise just

23   from hearing this today.  UCC1 is not the person they're

24   talking about.  They're talking about a third person saying

25   something about UCC1 and then I guess the prosecutor's

office that heard this didn't act on it.  I didn't hear anything about UCC1 not being a drug trafficker, simply that a third-party made an accusation.

THE COURT:  That's what Mr. Dominguez just said, but you and I are hearing different things.

MR. DOMINGUEZ:  Judge, I think he understands what I'm saying, because at the end of the --

THE COURT:  Perhaps I don't.

MR. DOMINGUEZ:  Right.  The Miami office never proceeded against UCC1 because they found the information categorizing him as a drug trafficker was not trustworthy. That's what was conveyed to the agent in this case.  And Mr. Palazzo here is aware of it because I know he's looked into that, because if he's looking into UCC1 he knows that that office never proceeded against him because the information was found not to be credible.

THE COURT:  Never proceeded against --

MR. DOMINGUEZ:  That's what I'm telling --

THE COURT:  Never proceeded against the other Defendant or never proceeded against UCC1?

MR. DOMINGUEZ:  Against UCC1.  The other Defendant gave the information.  They didn't trust it.  They didn't proceed.  They know.  We've told them for months.

MR. PALAZZO:  Your Honor, I don't know that, but what he's putting forth is not dispositive of UCC1 being a

1    drug trafficker simply because the Defendant is representing

2    that a separate cooperating Defendant said something about

3    UCC1 that apparently, and I don't know this to be true, but

4    apparently another prosecutor's office didn't act on.

5            I just want to draw the Court's attention back,

6    though, to the issue at hand today. The money that's

7    discussed in the plea agreement is not necessarily entirely

8    from UCC1. He's not the only drug trafficker that the

9    Defendant dealt with, and the Defendant admits that funds

10   from UCC1 were in an account that was commingled with other

11   drug proceeds and he admits that he diverted and used and

12   misused funds from that account. That means that he was

13   spending --

14           THE COURT: Wait. Wait. And you are relying upon

15   the factual basis of the plea agreement to support your

16   contentions?

17           MR. PALAZZO: Yes, Your Honor.

18           THE COURT: I just want the record to reflect the

19   factual basis for your argument.

20           MR. PALAZZO: Yes, Your Honor.

21           THE COURT: You may continue.

22           MR. PALAZZO: And then as far as this other issue --

23           THE COURT: Well, you can continue with what you

24   were talking about. You were talking about the fact that

25   there were -- UCC1 was not the only person that was a drug

trafficker, that there were others, and that the Defendant had acknowledged such in the factual basis for the plea agreement.

MR. PALAZZO: That's right. And that's why the plea agreement, the factual basis for the plea agreement is written in broad terms because the elements of the crime don't require the drug dollars to be pinned to a specific drug dealer. He had knowledge and he had the intent to move and to use drug dollars, and that's -- that's the end of the story. He agreed that he would make a legal argument today, a very narrow legal argument about impossibility. And I think we should go back to that, and the fact that the Eleventh Circuit, not just in Perez, but in United States versus Magluta which is from 2005, was discussing undercover drug money being misused by a Defendant. And the Eleventh Circuit found just the plain language reading of it and drew an analogy to stolen property cases and said that "laundered money does not become any less laundered because the Government helped the process along but chose not to stop it." It then goes on to say that "maybe it's somehow would be possible in certain circumstances but they weren't in the case at hand."

I think that carries the day in terms of adding the six offense levels in the sentencing guideline recommendation and that's why we're here today.

1    THE COURT:  Briefly, Mr. Dominguez.

2    MR. DOMINGUEZ:  Briefly, Judge.

3    THE COURT:  It's the Government's burden so

4  ultimately the Government will have the final argument with

5  regard to the enhancement.

6    MR. DOMINGUEZ:  Judge, he's obfuscating the facts,

7  because the reality is in the plea agreement it's very, very

8  clear, abundantly clear, that the funds and money that come

9  from the AGEO, that account we never agreed to drug

10  proceeds.  It's clear.  It's in the plea agreement.  It's

11  documented in several portions including the appellate

12  waiver which is -- so, given that part.  Now, the other

13  prong would be the other drug traffickers, none of which are

14  mentioned in the plea agreement, the only drug trafficker

15  supposedly was that UCC1 and we know as a matter of fact it

16  is incorrect and inaccurate.

17    THE COURT:  You know what, folks?  I'm sorry, but

18  what is really frustrating to the Court right now is that,

19  first of all, we're using, other than the individual's

20  names, UCC1 but, again, I keep getting these arguments about

21  the plea agreement, the plea agreement.  Where in the plea

22  agreement?  I need citations.  Okay?  I don't want to hear

23  argument because there are too many moving targets in this

24  argument in this case.

25    MR. DOMINGUEZ:  Right.

1          THE COURT:  So what I need everybody to do is when

2     you're making argument, I need you to have your plea

3     agreement.  I need you to refer me to the page, the line,

4     the paragraph, whatever, that can be used to identify,

5     because that, number one, that's the best way to do it

6     anyway so that the appellate record is perfected, but more

7     importantly, given the nature of the argument that you're

8     putting before the Court and the fact that we're talking

9     about other Defendants UCC1, UCC2, no.  I need to know where

10    in the plea agreement you are relying upon facts that you

11    say support a position or the other because I'm getting

12    different arguments from Counsel which I rarely get based

13    upon what a plea agreement says.

14         It's quite unusual for everybody to be looking at

15    the same document and I have two different arguments with

16    regard to what it says.  That's why I need you to show me

17    exactly what in the plea agreement you are referring to.

18         Did you find the provision that you were referring

19    to, Mr. Palazzo?

20         MR. PALAZZO:  Yes, Your Honor.  Starting on Page 25

21    of the plea agreement which is Document 59, the Defendant

22    and his co-conspirator engaged in an illegal scheme to

23    misappropriate, launder and spend at least 9,000,000 in drug

24    proceeds while the Defendant was a special agent with the

25    DEA.  Later on on Page 27 is the paragraph I already cited

1    talking about making false documentations in order to help a

2    co-conspirator known to the DEA as a drug trafficker and

3    money launderer in Colombia.

4         On the next page, Page 28, it was further part of

5    the scheme that the Defendant used his position as a DEA

6    special agent secretly to divert drug proceeds from

7    Government control to the personal control of himself and

8    his co-conspirators without Government authorization.

9         On Page 33, again, I mentioned this before, but in

10   2015, the Defendant caused DEA agents through Tampa, Florida

11   to unwittingly file official investigative reports that

12   contain material falsehood and omissions and conceal the

13   true nature and location, source, ownership and control of

14   drug proceeds picked up in the Netherlands.  Then it goes on

15   to describe how a portion of those proceeds, $30,000 wired

16   to Spain.

17        On Page 35, beginning in approximately January of

18   2015, the Defendant utilized drug proceeds diverted from

19   active DEA investigations through victim one's account to

20   buy himself and his Co-Defendant a home in Cartagena,

21   Colombia.

22        For those reasons, Your Honor, I think there's a

23   robust record that the Defendant has stipulated to showing

24   that he indeed knew that he was laundering drug proceeds and

25   therefore the six offense level enhancement is appropriate

1    and recommended by the Government.

2            THE COURT:  Okay.  Thank you.

3            MR. DOMINGUEZ:  Judge, there is no such stipulation.

4    It's clear.  Referring to --

5            THE COURT:  Wait, wait, wait.  There's no such

6    stipulation with regard to what the facts of the plea

7    agreement are?

8            MR. DOMINGUEZ:  Yes, Judge.

9            THE COURT:  Is that your argument?

10           MR. DOMINGUEZ:  Yes.  Page --

11           THE COURT:  Don't I see the Defendant's initials on

12   each page of the factual basis of the plea agreement?

13           MR. DOMINGUEZ:  Yes, Judge.

14           THE COURT:  And does that not mean anything to you?

15           MR. DOMINGUEZ:  Of course it does, Judge.

16           THE COURT:  So then why do you say there's no

17   stipulation?

18           MR. DOMINGUEZ:  Document 59, Page 8, the plea

19   agreement, "the Defendant does not and will not dispute any

20   of the factual basis in the section of the plea agreement

21   but reserves the right to argue at sentencing without new

22   facts."

23           THE COURT:  Right.  So that means that you agree to

24   the facts in the plea agreement.

25           MR. DOMINGUEZ:  Right.  Except the way they

characterize -- or else this means nothing, because we're
saying that it's -- he's characterizing it as drug proceeds.
We're saying they're not drug proceeds because it's legally
impossible. That's what that paragraph specifically refers
to.

THE COURT: What's the paragraph again you're
referring to?

MR. DOMINGUEZ: It's Page 8 of the plea agreement at
the top, and it's saying that we do not agree that these are
drug proceeds because it's legally impossible, and it cites
specifically the case of United States versus Breque, 964
F.2d 381, Fifth Circuit, 1992, and it's because we're saying
it's legally impossible for these to be drug proceeds
because they are not. They are from a DEA account, so
everywhere he refers to as drug proceeds, we're saying here
that we obviously didn't agree with the title of it being
drug proceeds.

And then we refer to it as well in the appellate
waiver section which I cited earlier where we reserve the
right to appeal the issue of it being drug proceeds. But
anyway, that's the meaning of that paragraph.

It's clear that we never agreed to that, and we say
that it's legally impossible as part of a DEA ongoing
undercover operation and it cannot continue to be drug
proceeds under 2S1.1, and that paragraph clarifies

everything he says that we agree to. Yeah. We agree to those facts but we did not agree to the characterization of it as being drug proceeds, because otherwise this paragraph here would not mean anything. We put this in specifically to point out we're challenging the nature of it being called drug proceeds under a specific case law and under the guidelines.

THE COURT: So although -- I don't understand why you would agree to a factual basis that labels them drug proceeds?

MR. DOMINGUEZ: Because what we compromised, and Mr. Palazzo knows, I said, okay, you can call it -- you can call it pink money. I don't care what you call it, but as long as you know that I'm not agreeing to it because it is legally impossible, and that's why we put the paragraph in.

So in order to be able to get this thing accomplished and done, you can call it whatever he wants to as long as it's clear in that paragraph, I'm saying it is legally impossible for them to be under this case law, and if it's legally impossible, it doesn't matter who agrees to it, Judge. It's legally impossible, period. It's illegal.

I could agree to it all day long. If it is, in fact, not drug proceeds by the nature of the proceeds, then it's not. It's irrelevant who agrees to it. So we left the language the way it was. This was negotiated that way, and

1    then I inserted that specific carve out into the appellate

2    waiver as well to make sure, listen, we're not agreeing that

3    these are drug proceeds because under the case law it is

4    legally impossible, period.

5           THE COURT:  But you don't have any case law that

6    says that.  The cases you've cited to me don't state that.

7           MR. DOMINGUEZ:  Judge, the case that I'm referring

8    and I'm relying on that case, specifically Breque.  This is

9    the same one.  United States v. Breque, 964, the Fifth

10   Circuit, 1992.  That's specific -- that case does support

11   our position where the person -- those funds by the very

12   nature were not drug proceeds.

13          THE COURT:  But you're now in the Eleventh Circuit.

14          MR. DOMINGUEZ:  Exactly.  This is persuasive because

15   the Fifth --

16          THE COURT:  When -- what year was Breque?  Was it

17   before the Eleventh Circuit was created?

18          MR. DOMINGUEZ:  No, it was not, Judge.  It's after.

19   But it was -- we were part of the Fifth and then there was a

20   case dealing with Breque but it was distinguished because it

21   was before the amendment, so, and then the Magluta case is

22   completely -- which they cite is completely nonapplicable in

23   this case.  This is the more direct case right on point

24   saying once these funds go into a specific controlled

25   account or come out of an account by the Government, they

themselves are not drug proceeds, otherwise, whenever
anybody uses funds out of that account they would be money
laundering.  Other agents, other -- everybody using it for
travel, for funding, buying cars and all those things,
everybody would be money laundering that they would be using
money that's always drug proceeds no matter what.  Once they
go into that DEA account and it's controlled by the DEA,
that's it, it's over.  It doesn't -- it ceases to be drug
proceeds, and that's why everybody else can go ahead and use
it for their travel, for their investigations, to buy
laptops, to buy cellphones, all those things they did with
that money and then they document it and they submit an
inventory and every dollar that comes out of the account is
accounted for.  So that's what we agreed to, Judge.  That's
what's in writing.  And, you know, I thought that he was
trying to pull an "I got you" moment like that.  He knows
from specifically day one that we never, never ever agreed
that those were, in fact, drug proceeds, and that's the
truth.

THE COURT:  Okay.  Final comments from the
Government.

MR. PALAZZO:  Yes, Your Honor.  With regards to
Breque that was prior to the enhancement being amended, and
I think that Magluta up in the Eleventh speak directly, you
know, in contrast to that cited case.  And --

1          THE COURT:  Which one did you just cite?

2          MR. PALAZZO:  United States versus Magluta,

3     M-A-G-L-U-T-A.  It's from 2005.

4          THE COURT:  Okay.  Yes, I have it.  Uh-huh.

5          MR. PALAZZO:  And on Page 27 of the plea agreement

6     there is a discussion of all the kickbacks are outlined that

7     the Defendant received and admitted that he received, and in

8     Subparagraph B, the Defendant took official actions as a DEA

9     special agent including the following violations of his duty

10    in return for bribes and kickbacks.

11         Subparagraph B discusses doing things on behalf of a

12    drug trafficker, so aside from all the other references to

13    drug proceeds that are in the plea agreement here, we have

14    an example of a quid pro quo payment for official actions on

15    duty from a drug trafficker.  I think a reasonable inference

16    can be made there that someone's being paid by a drug

17    trafficker with drug proceeds and is being paid to promote

18    the activities of a drug organization.  That fits all the

19    element of money laundering.  Aside from diverting payments

20    for himself from investigations that we've heard about

21    today, that's one way that the Court can add the six level

22    enhancement, but here I'm pointing out another.  The receipt

23    of kickbacks from a drug trafficker is another form of

24    laundering drug proceeds, and for those reasons the six

25    level enhancement should be recognized and enforced.

1          THE COURT:  Are you referring to UCC1 as the drug

2     trafficker or just an unknown?  Because the plea agreement

3     is not specific.  I'm looking at Paragraph B on Page 27

4     including in the investigation of a co-conspirator known to

5     the DEA as a drug trafficker and money launderer in

6     Colombia.

7          When I look at Paragraph C, and it refers things

8     that the Defendant delivered to the Defendant's

9     co-conspirators rather than directly to associates of

10    targeted drug trafficking organizations.  So are you

11    specifically relying upon UCC1 or just other co-conspirators

12    who you contend were drug traffickers?

13         MR. PALAZZO:  I am contending all of the above.

14    It's not meant to exclusively be a reference to UCC1.  We

15    refer to un-indicted co-conspirators in the indictment.  We

16    went out of our way not to do that here so as not to limit

17    these facts to specific individuals because the defendant's

18    conduct was so prolific.

19         MR. DOMINGUEZ:  Judge, I don't know what he's

20    proffering but that refers to the UCC1, and that's the only

21    one they have.

22         MR. PALAZZO:  I'm --

23         MR. DOMINGUEZ:  If he saying that in good faith, let

24    him tell you who he's talking about.

25         MR. PALAZZO:  I'm referring to the plain language of

1    the document, Your Honor.

2        THE COURT:  Okay.  You know what?  Counsel, we're

3    going to be in recess for ten minutes.

4    (Recess had at 11:41 a.m.)

5    (Court in session at 11:57 a.m.)

6        THE COURT:  All right.  Counsel, I am terribly

7    troubled by this plea agreement and the issues that have

8    been raised before the Court today.  I'm going to continue

9    this sentencing hearing.  I'm not even certain at this point

10   that I'm going to accept the plea agreement.  If I don't

11   accept the plea agreement and I know that the agreement says

12   that if it is not accepted by the Court, neither the United

13   States nor the Defendant will be allowed to withdraw from

14   the plea agreement and the Defendant will not be allowed to

15   withdraw his plea of guilty.  If I don't accept it, I may

16   allow the Defendant to withdraw his plea of guilty and we

17   may find ourselves in a trial.

18       This is totally unacceptable to the Court.  I don't

19   understand how you have a plea agreement which has specific

20   facts that talks about drug proceeds, then you have another

21   provision that says except that I don't agree that it's drug

22   proceeds.  Well, if you don't agree that it's drug proceeds,

23   you don't sign the factual basis which says it is drug

24   proceeds.

25       There are just a number of problems.  I have Defense

1    Counsel calling the Government out as violating Brady.  I

2    mean it's just -- I'm not going to go forward today.  I'm

3    going to do some independent research, look at these issues

4    further, and I'll issue a written order.

5        I very well may not accept the plea agreement, but

6    you will be notified by whatever actions I take at a

7    subsequent hearing.  I would suggest that you all go

8    somewhere and sit down in a conference room and see if you

9    can resolve these issues because it is -- I've never ever

10    seen anything like this with regard to a plea agreement.

11        You know, the parties agree and that's why I asked

12    how do you sign a plea agreement that says drug proceeds and

13    then you carve them out?  No.  You don't agree to it.  If

14    you don't believe they're drug proceeds, you just don't

15    agree to it.  And the testimony that I heard even though the

16    agreement says, again, that the Defendant would not

17    interject new facts, Defendant comes in today and wants to

18    interject new facts into this, so it's really been something

19    else is the kindest way I could describe what has occurred

20    this morning in this proceeding.

21        And so I'm going to continue the hearing and any

22    further actions that I take, you'll be notified via CM/ECF.

23    Is there anything else before we conclude today's

24    proceeding?

25        MR. DOMINGUEZ:  Nothing from the defense, Your

1    Honor.   Thank you.

2              THE COURT:   I truly think you all need to talk about

3    these issues because there was some serious allegations made

4    in this courtroom this morning that cause me deep concern.

5    And I mean, like I said, I'm not even sure at this point I'm

6    going to accept this plea agreement, so we all may be

7    looking at a trial in this case.   All right.   We are

8    adjourned.

9    (Court adjourned at 12:01 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  UNITED STATES DISTRICT COURT   )

2                                 )

3  MIDDLE DISTRICT OF FLORIDA     )

4

5          I, SHARON A. MILLER, Official Court Reporter for the

6     United States District Court, Middle District of Florida, do

7     hereby certify that pursuant to Section 753, Title 28,

8     United States Code that the foregoing is a true and correct

9     transcript of the stenographic notes taken by computer-aided

10    transcription taken in the above-entitled cause by the

11    undersigned and that the transcript format is in conformance

12    with the regulations of the Judicial conference of the

13    United States.

14 /S/Sharon A. Miller, CSR, RPR, CRR, FCRR

15 Official Court Reporter

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION

1    UNITED STATES DISTRICT COURT   )

2                                    )

3    MIDDLE DISTRICT OF FLORIDA      )

4

5            I, SHARON A. MILLER, Official Court Reporter for the

6    United States District Court, Middle District of Florida, do

7    hereby certify that pursuant to Section 753, Title 28,

8    United States Code that the foregoing is a true and correct

9    transcript of the stenographic notes taken by computer-aided

10   transcription taken in the above-entitled cause by the

11   undersigned and that the transcript format is in conformance

12   with the regulations of the Judicial conference of the

13   United States.

14   /S/Sharon A. Miller, CSR, RPR, CRR, FCRR

15   Official Court Reporter

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT ~ MDFL ~ TAMPA DIVISION